

**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

EAG/AH
F.#2011R00006

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

May 21, 2011

The Honorable Brian M. Cogan
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

                    Re:  United States v. Aleksey Breynin
                         Criminal Docket No. 11-471 (BMC)

Dear Judge Cogan:

          The government respectfully submits this letter in
connection with sentencing in the above-referenced case, which is
scheduled for May 24, 2012 at 9:30 a.m.  The government submits
this letter in opposition to the defendant's request for a
sentence below the applicable Guidelines range.  The government
also submits that the Guidelines range calculated by the United
States Probation Department ("Probation Department") is
inaccurate because it greatly underestimates the applicable loss
amount and fails to include several applicable sentencing
enhancements, as further explained below.  The government asserts
that the applicable Guidelines range is 70 to 87 months'
imprisonment.

<u>BACKGROUND</u>

          As stated in the Presentence Investigation Report
("PSR"), the defendant was involved in a multi-year scheme in
which he, along with co-conspirators in Eastern Europe, used
account information stolen from United States credit card holders
to purchase high-end merchandise which was ultimately shipped to
various locations in Eastern Europe.  See PSR ¶¶ 3 - 10.
Specifically, co-conspirators in the scheme obtained account
information for U.S. credit card holders through an undetermined
means and then initiated a change of billing address with the
credit card company to a "new address."  Once the billing address
had been changed, the defendant's co-conspirators overseas made
purchases using the compromised credit cards and those purchases
were shipped to the "new address."  The investigation revealed
that the "new address" used was either 1) an address associated

with a "re-shipper," i.e., an unwitting participant who was recruited online and hired to receive merchandise and ship it to other locations in exchange for payment, or 2) an address associated with the defendant.  For the most part, the re-shippers who were identified through the investigation were directed to receive the purchased items and either ship them abroad (primarily to Eastern Europe) or to an address associated with the defendant.  As stated in the PSR, Skype chats obtained from the defendant's computer established his direct involvement with his co-conspirators in Eastern Europe with respect to the use of compromised credit cards to fraudulently purchase the high-end merchandise that was later shipped to him.  See PSR ¶ 16.  Moreover, as explained further below, evidence obtained both from a reshipper and from a search of the defendant's safe, indicate the defendant's direct involvement in paying reshippers who participated in the scheme.  See footnote 2, infra.

        On January 3, 2012, the defendant pled guilty to Count One of a single-count indictment, charging mail fraud, in violation of 18 U.S.C. § 1341.

        The Probation Department calculated the total offense level pursuant to the United States Sentencing Guidelines ("Guidelines" or "U.S.S.G.") to be 13.  PSR ¶ 36.  This calculation was based upon a base offense level of 7 (see U.S.S.G. § 2B1.1(a)(1)), an upward adjustment of 2 levels because the offense involved 10 or more victims (see U.S.S.G. § 2B1.1(b)(2)(A)(I)), an upward adjustment of 6 levels because the loss amount exceeded $30,000 (see U.S.S.G. § 2B1.1(b)(1)(D), and a 2 level reduction for acceptance of responsibility (see U.S.S.G. § 3E1.1(a)).  Because the defendant is in Criminal History Category I, the Probation Department calculated the applicable Guidelines sentencing range to be 12 to 18 months' imprisonment.  For the reasons stated below, the government asserts that this calculation fails to include several applicable sentencing enhancements, and underestimates the applicable loss amount.

<u>ARGUMENT</u>

I.   <u>Legal Standard</u>

        "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark."  <u>Gall v. United States</u>, 128 S. Ct. 586, 596 (2007) (citation omitted).  Next, a sentencing court should

"consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, he may not presume that the Guidelines range is reasonable.  He must make an individualized assessment based on the facts presented." Id. at 596-97 (citation and footnote omitted).

II.  The Advisory Guidelines Range is 70 to 87 Months' Imprisonment

        For the following reasons, the government asserts that the appropriate loss amount is $1,483,500, and sentencing enhancements for offenses involving the receipt of stolen property (see U.S.S.G. § 2B1.1(b)(4)), the trafficking of unauthorized access devices (see U.S.S.G. § 2B1.1(b)(10)(B)(i)), and the commission of a substantial part of the scheme outside of the United States (see id. at § 2B1.1(b)(9)(B)) apply, resulting in a total offense level of 27.[1]  Because the defendant is in Criminal History Category I, the applicable advisory Guidelines range should be 70 to 87 months' imprisonment.

        A.   Loss Calculation Under the Guidelines

        Section 2B1.1 of the Guidelines calls for graduated increases to a defendant's offense level depending on the amount of loss caused by the offense.  Loss is defined as "the greater of actual loss or intended loss," where "actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense."  id. at § 2B1.1 cmt. 3(A).  "Pecuniary harm" is the "harm that is monetary or that otherwise is readily measureable in money," and to be reasonably foreseeable, it must be "harm that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense."  Id. at § 2B1.1 cmt. 3(A)(i)-(iv).

        Importantly, the Guidelines explain that the sentencing court "need only make a reasonable estimate of the loss."  Id. at § 2B1.1 cmt. 3(c).  Although it may be that "[d]etermining this amount is no easy task[,] . . . some estimate must be made for Guidelines' [calculation] purposes, or perpetrators of fraud would get a windfall."  United States v. Ebbers, 458 F.3d 110, 127 (2d Cir. 2006).  With respect to the methodology for calculating the loss, the Guidelines state only that "[t]he estimate of the loss shall be based on available information, taking into account, as appropriate and practicable under the

---

[1]     Because the defendant's total offense level is greater than 16, this calculation includes a three level reduction for acceptance of responsibility.  See U.S.S.G. § 3E1.1(b).

circumstances, factors such as . . . . [t]he approximate number of victims multiplied by the average loss to each victim." U.S.S.G. § 2B1.1 cmt. 3(c)(iii) - (iv).

        B.   <u>Analysis of Loss</u>

        The government proffers the following with respect to losses attributable to the scheme that the defendant engaged in with his coconspirators:

- Documentary evidence confirms that the defendant has been actively engaged in this scheme since 2005. Specifically, between 2005 and 2009, while the defendant was residing at 1365 West 7th Street in Brooklyn (the "West 7th Street Address"), commercial databases indicate that account information for approximately 20 individuals residing in a number of different states was altered to indicate a primary billing address at the West 7th Street Address. Many of the individuals who were contacted by agents stated that they recalled having been the victims of an account takeover scheme that involved having their primary billing address on a specific credit or debit account altered to the West 7th Street Address. Several of these individuals were able to provide documents and/or statements indicating that fraudulent orders were placed on these accounts and delivered to the West 7th Street Address.

- On February 2, 2009, the defendant submitted a change of address request with the the United States Postal Service ("USPS") from the West 7th Street Address to a residence on Ocean Avenue (the "Ocean Avenue Address"). The date of the address change corresponds to the time at which several credit card accounts were compromised and the address was changed to the Ocean Avenue Address. Also at this same time, similar fraudulent activity ceased at the West 7th Street Address.

- In connection with the execution of a court-authorized search of the defendant's residence on July 23, 2009, agents seized multiple packages of merchandise purchased with compromised credit card accounts valued at approximately $2,500.

- Between June and July 2009, agents recovered packages containing merchandise purchased with compromised credit card accounts from three re-shippers associated

with the defendant's scheme.  The merchandise seized
from these reshippers was valued at approximately
$11,500.

- An analysis of the credit card accounts associated with
the merchandise seized from the defendant's residence
on July 23, 2009 and from three re-shippers between
June and July 2009 reveals that the merchandise was
purchased with 14 separate compromised credit card
accounts.  On average, each of those credit card
accounts suffered a loss of $2,000.

As stated in the PSR, the government has entered into a non-
prosecution agreement with the defendant's son and co-
conspirator, Boris Breynin.  The agreement obligates Boris
Breynin to cooperate with the government, including testifying at
any <u>Fatico</u> hearing associated with Aleksey Breynin's sentencing.
Boris Breynin provided the following information to the
government:

- Boris began participating in the scheme to receive and
re-ship packages at his father's direction in 2005,
when he was 16 years old and living with his family at
the West 7th Street Address.  Boris estimated that,
during the course of the scheme, which continued when
the family moved to the Ocean Avenue Address and lasted
until the defendant's arrest in April 2011, between 2
and 5 packages arrived each day.

- Boris participated in the scheme at the direction of
his father, who was domineering and intimidating, and
required Boris's help due to his limited English
proficiency.  Because Boris dropped out of high school
around the time that he began to participate in the
scheme, and has never had a job, his participation
included receiving packages at home during the day,
contacting his father's co-conspirators in Europe to
confirm receipt, and then bringing those packages to
the post office for reshipment to other locations,
primarily in Eastern Europe.  Boris felt that he had no
choice but to follow his father's direction because the
defendant would become angry if Boris, or another of
his sons, rejected a package.  Packages were typically
shipped to Eastern Europe shortly after arrival at the
Breynin's apartment.

- The contents of the packages included electronics,
clothing, car parts, DJ equipment and baby strollers,

among other items.

- In addition to receiving and shipping packages at the direction of the defendant, on at least two occasions, the defendant provided lists of merchandise orders to Boris Breynin, which included the names and credit card numbers of individuals who were unknown to Boris Breynin.  The defendant asked Boris Breynin to contact the various companies associated with the merchandise orders to inquire whether the orders had been successfully processed.  Boris Breynin indicated that, approximately fifty percent of the time, the company would indicate that the order was not processed because payment had been denied.

- After Secret Service agents conducted a search of the family's apartment in July 2009, the defendant continued to receive packages.  While the defendant used DHL to receive packages between 2005 and July 2009, after agents conducted the search of the family's residence, the defendant instead began using USPS because he believed that agents would not be able to trace the packages.

Based on this information, the government asserts that an accurate estimate of the losses attributable to this defendant, where "actual loss" is the "reasonably foreseeable pecuniary harm that resulted from the offense," is $1,483,500.  U.S.S.G. § 2B1.1 cmt. 3(A). This estimate is based on the following

- The approximate value of the merchandise seized from the defendant's residence on July 23, 2009 was $2,500.  Because, according to Boris Breynin, 2-5 packages typically arrived each day and packages were shipped out shortly after their arrival, the value of merchandise seized on one day – July 23, 2009 – is a conservative estimate of the value of merchandise received by the defendant for one week.  The instant offense occurred from approximately August 2005 through April 2011, for a total of 276 weeks.  If the conservative estimate of $2,500 for the value of merchandise for one week is multipled by 276 weeks, the total loss amount is $690,000.

- Between June and July 2009, agents seized approximately

$11,500 worth of merchandise from three reshippers.[2] Through the investigation, agents were able to identify numerous additional re-shippers and to interview 7 re-shippers.  As such, it is clear that the $11,500 worth of merchandise actually seized from three of the re-shippers between June and July 2009 is a gross underestimation of the total value of merchandise purchased and sent through re-shippers at part of this scheme.  A conservative estimate of $11,500 worth of merchandise each month for the 69 month duration of the scheme results in a total loss amount of $793,500 associated with reshippers.[3]

- Taken together, even assuming that some of the merchandise received by reshippers was sent to the

---

[2]    Agents determined the role played by reshippers in the scheme through interviews of at least seven reshippers associated with the scheme.  For example, on August 26, 2009, agents interviewed one of the reshippers ("Reshipper #1").  Reshipper #1 stated that she had posted her resume on a career website and was then contacted via email by someone who was looking to employ someone as a "shipping manager."  Reshipper #1 accepted the job, which she understood to involve receiving packages by mail, checking the contents of the packages, printing invoices and then using shipping labels sent to her via email for UPS pickup.  She provided agents with the documentation that she had, which included an email chain between herself and individuals using the names "Alex" and "Dmitry."  The email states that these individuals are sending her payment for her services in the form of a money order, an image of which is attached to the email.  The attachment shows a money order made out to Reshipper #1 from "Aleksey Breynin." The handwriting on the money order appears consistent with that utilized by Aleksey Breynin to sign an advice of rights form at the time of his arrest.  In addition, a receipt for a money order to Reshipper #1 was found in a safe located in Aleksey Breynin's during the execution of the search warrant on July 23, 2009.

[3]    With respect to the extensive nature of the scheme in which the defendant was engaged, agents were able to recover telephone records associated with "Dima," one of the co-conspirators with whom the defendant communicated regarding the scheme over Skype.  Those phone records evidenced hundreds of telephone communications with 800 numbers associated with debit cards for Discover, AMEX, Capital One, and other credit card providers.  For example, during one month alone Dima made over 389 calls to numbers associated with credit card companies.

defendant, a total estimate of the loss associated with the defendant and his co-conspirators, is $1,483,500.

Moreover, this type of estimation is consistent with caselaw in this Circuit.  In United States v. Abiodun, 536 F.3d 162 (2d Cir. 2008), the Second Circuit upheld a district court's determination of loss amount in a case similar to this matter. In Abiodun, the defendants were part of a loosely connected group of some thirty individuals who, over the course of five or six years, engaged in a scheme to commit credit card and access device fraud through the use of stolen credit information. Abiodun, 536 F.3d at 164.  To accurately estimate losses for purposes of arriving at an appropriate Guidelines calculation, the Abiodun court used the following analysis.  A cooperating witness who was one of the organizers of the scheme estimated that members of the conspiracy illegally downloaded more than 20,000 credit reports, approximately 40% of which were "useful," in that a "useful" credit report would yield approximately two useable credit cards or credit lines.  Id. at 164.  Each useable credit card would have an average of $5,000 in available credit. Id.  Taken together, one could estimate that members of the conspiracy obtained an average of approximately $4,000 per credit report.  Cooperating witnesses also provided testimony regarding the approximate number of credit reports purchased by each defendant.  Using this information, the district court multiplied the approximate number of credit reports purchased by each defendant by the average loss amount of $4,000 per credit report to determine an applicable loss amount for each defendant.  In upholding the district court's determination with respect to loss amount, the Second Circuit concluded that

> [I]n light of the [Guidelines] application note's observation that a district court may estimate loss by multiplying the "approximate number of victims" by "the average loss to each victim," id. Cmt n. 3(C)(iii), the District Court did not err in (1) using aggregate figures to estimate the average loss per credit report (a proxy for the average loss per victim) and (2) estimating the number of victims affected by [the defendant's] conduct by referring to the number of credit reports [the defendant] purchased, rather than conducting a separate hearing to determine (a) how many of these particular reports were actually exploited and (b) to what extent.

Id. at 167.

The methodology employed by the government herein is similar to that utilized in <u>Abiodun</u> and is a "reasonable estimate of the loss" consistent with the Guidelines.  U.S.S.G. § 2B1.1 cmt. 3(c).  Even if the Court disagrees with this estimation, the government asserts, in the alternative, the Court may significantly depart upward from the Guidelines range proposed by Probation to account for the vast underestimation of the applicable loss amount.  <u>See</u> <u>Ebbers</u>, 458 F.3d at 127 ("[S]ome estimate must be made for Guidelines' [calculation] purposes, or perpetrators of fraud would get a windfall.").

C.   <u>Additional Applicable Enhancements</u>

The defendant's conduct with respect to this offense also warrants several enhancements to his applicable Guidelines offense level.  Section 2B1.1(b)(4) of the Guidelines provides for a two level enhancement to the applicable offense level "if the offense involved receiving stolen property, and the defendant was a person in the business of receiving and selling stolen property."  The application notes to the Guidelines state that, for the purpose of this enhancemnet, the Court shall consider the following non-exhaustive list of factors in determining whether the defendant was in the business of receiving and selling stolen property: 1) the regularity and sophistication of the defendant's activities; 2) the value and size of the inventory of stolen property maintained by the defendant; 3) the extent to which the defendant's activities encouraged or facilitated other crimes, and 4) the defendant's past activities involving stolen property.  <u>See</u> U.S.S.G. § 2B1.1 cmt. 5.  Here, the defendant was involved in a multi-year scheme to use stolen credit cards to purchase high-end merchandise for the benefit of himself and his co-conspirators.  While the mechanism used by the defendant and his co-conspirators to obtain access to those credit cards is unknown, the regularity with which they conducted their operation necessitates a high degree of sophistication.  Moreover, as demonstrated by the loss calculation above, the value and size of the inventory of merchandise purchased with the stolen credit cards was massive.  Finally, the defendant's activities certainly encouraged and facilitated other crimes, including identity theft and fencing of stolen merchandise.  The two level enhancement is, therefore, clearly applicable here.

In addition, U.S.S.G. § 2B1.1(b)(10)(B)(i) provides that "if the offense involved . . . trafficking of any unauthorized access device . . . increase by 2 levels."  For purposes of this enhancement, "unauthorized access device" has the meaning of that term in 18 U.S.C. § 1029(e)(3).  <u>See</u> U.S.S.G. § 2B1.1 cmt. 9.  Section 1029(e)(1) defines an "access device" to

include "any card . . . account number . . . or other means of account access that can be used . . . to obtain money, goods, services or any other thing of value."  Section 1029(e)(3) defines "unauthorized" access device as "any access device that is . . . stolen . . . or obtained with intent to defraud."  In this case, the defendant, along with his co-conspirators, clearly trafficked in compromised credit cards as evident from his Skype chats, his provision of lists of credit card numbers and associated information to Boris Breynin, and the accomplishment of this scheme generally.

Section 2B1.1(b)(9)(B) provides that, if "a substantial part of a fraudulent scheme was committed from outside the United States . . . increase by two levels."  As described above, several of the defendants co-conspirators were located in Eastern Europe, the defendant communicated with these co-conspirators via Skype chats online, and the defendant shipped the majority of the merchandise purchased with compromised credit cards to Eastern Europe.  This enhancement is thus also warranted.

The cumulative effect of these enhancements, including the loss amount asserted by the government, is a total offense level of 27, resulting in an advisory Guidelines range of 70 to 87 months' imprisonment.

III.  The Court Should Sentence the Defendant Within the Advisory Guidelines Range

In his letter dated May 9, 2012, the defendant requests a below-Guidelines sentence on the basis of medical conditions he has suffered historically.  (Defendant's Letter ("Def's Ltr.") at 2).  The government respectfully submits that a sentence within the accurately calculated Guidelines range of 70 to 87 months' imprisonment is appropriate and warranted in this case.

A.  Historical Medical Issues

Section 5H1.4 of the Guidelines makes clear that "[p]hysical condition . . . including physique, is not ordinarily relevant in determining whether a sentence should be outside the applicable guideline range."  U.S.S.G. § 5H1.4.  As the Second Circuit has observed, however, a condition that renders a defendant "seriously infirm" may be sufficient to warrant a departure.  United States v. Altman, 48 F.3d 96, 104 (2d Cir. 1995).  Elaborating on this standard, the Altman court suggested that a downward departure under Section 5H1.4 is not warranted unless the defendant is seriously infirm with a medical condition that cannot be cared for adequately by the Bureau of Prisons.

10

See id.; see also U.S.S.G. § 5H1.4.

In this case, the defendant has represented that he has suffered from various medical conditions in the past, the most serious of which appear to have been treated successfully and were resolved between the years 2003 and 2008.  Specifically, he states that he was diagnosed with sacroidosis in 2002 and, due to its treatment with the medication prednizone, experienced certain side effects.  PSR ¶¶ 61, 62, Def's Ltr. at 3.  According to the defendant, as a result of taking the medication prednizone, he experienced (1) extreme weight gain, (2) glaucoma and cataracts, and (3) decreased sexual desire and erectile dysfunction.  Def's Ltr. at 4-5.  To treat these side effects, the defendant apparently had successful cataract surgery in 2003 and weight loss surgery in 2008.  Id.  As his sacroidosis, obesity and cataracts were resolved between four and nine years ago, they no longer bear any relevance to this Court's sentencing decision in this case.  See Def's Ltr. at 6 ("[The defendant's] health appears to have stabilized.").

With respect to the medical ailments that the defendant claims to currently suffer, there is no indication that any of the conditions rises to a severity sufficient to warrant a departure under Altman.  Specifically, the defendant states that he currently suffers from asthma, sleep apnea, high cholesterol, acid reflux, diabetes and high blood pressure and occasional numbness in his leg.  Def's Ltr. at 5.  Notably, none of these ailments has impaired the defendant's ability to work as a driver on a full time basis, which he reports that he has done since 2005.  PSR ¶¶ 59, 60, 61.  In short, nothing about the defendant's medical condition is sufficiently extraordinary to take his case outside of the heartland of cases contemplated by the Guidelines. In fact, the defendant states in his submission that his health "appears to have stablized."  See Def's Ltr. at 6.  Moreover, the defendant has not argued and cannot contend that the Bureau of Prisons would be incapable of monitoring and treating any of his claimed ailments.  Rather, the defendant asks for a non-Guidelines sentence because of the "increas[ed] . . . chance" that the Bureau of Prisons would fail "to respond appropriately to any new medical crisis."  Def's Ltr. at 6.  Accordingly, the defendant's motion for a non-Guidelines or below-Guidelines sentence on the basis of his medical condition should be denied.[4]

---

[4]     Moreover, the cases cited by the defendant in support of a below-Guidelines sentence based on health conditions are clearly inapposite and involved serious impairments that could not effectively be treated by the Bureau of Prisons.  See, inter

C.   Factors of 18 U.S.C. § 3553(a)

1.   History and Circumstances of the Offense

The defendant pleaded guilty to a serious offense that required prolonged, concerted and calculated acts on his part to repeatedly defraud individuals of substantial sums of money. This was not a one-time incident; rather, the defendant participated in this scheme on a daily basis for six years. Despite protests from his wife and son, whom he conscripted to help in his criminal conduct, as well as the execution of a search warrant by law enforcement agents in 2009, this defendant refused to stop.  Under these circumstances, it is clear that only a significant period of incarceration is likely to deter future criminal conduct by this defendant.

2.   History and Characteristics of the Defendant.

The history and characteristics of the defendant weigh in favor of a period of incarceration as well.  See 18 U.S.C. § 3553(a)(1).  Although the defendant does not have a prior criminal record, the defendant's history with respect to this scheme indicates that his disregard for the law has been prolonged and consistent.  Not only did the defendant's scheme continue unabated for approximately six years, but also the search warrant executed on the defendant's home in July 2009 did not deter his continued involvement; rather, the defendant changed shipping companies in an attempt to subvert law enforcement efforts to stop him.  Perhaps most strikingly, the defendant also involved his 16-year-old son and intimidated him into becoming the defendant's partner in the scheme.[5]

3.   The Need for the Sentence Imposed

alia, United States v. Greenwood, 948 F.2d 645 (4th Cir. 1990)(defendant had lost both legs below the knee); United States v. McClean, 822 F.Supp. 961, 962 (E.D.N.Y. 1993) (defendant was severly crippled from polio; United States v. Velasquez, 762 F.Supp. 39, 40 (E.D.N.Y. 1991) (defendant had life-threatening cancer).  The defendant's contention that "Mr. Breynin suffers precisely the type of poor health that these [cases] contemplate" is simply inaccurate.  See Def's Ltr. at 3.

[5]   Although the defendant's sentencing submission suggests that he is a hard worker and provider for his family, the lack of any letters of support from his wife and three sons belies these self-serving statements.

Given the nature of the crime to which the defendant pleaded guilty, and the defendant's history and characteristics, a period of incarceration within the applicable Guidelines range is appropriate here to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense."  18 U.S.C. § 3553(a)(2)(A).

CONCLUSION

For the foregoing reasons, the defendant should be sentenced within the advisory Guidelines range of 70 to 87 months' incarceration.


Respectfully submitted,

LORETTA E. LYNCH
United States Attorney


By: _____/s/_____
    Amanda Hector
    Assistant U.S. Attorney
    (718) 254-6212


cc: Douglas Morris, Esq. (by ECF)
    Sindee Hasnoot, U.S. Probation Officer (by email)
    Clerk of Court (BMC) (by ECF)

13